UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SHAKEE PERKINS,

                              Plaintiff,

              v.

ADA PEREZ, *et al.*,

                              Defendants.

No. 17-CV-1341 (KMK)

OPINION & ORDER

Appearances:

Shakee Perkins
Coxsackie, NY
*Pro se Plaintiff*

Janice Powers, Esq.
New York State Office of the Attorney General
White Plains, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

Shakee Perkins ("Plaintiff"), currently incarcerated at Greene Correctional Facility, brings this pro se Action under 42 U.S.C. § 1983 against Superintendent Ada Perez ("Perez"), Medical Director John Benheim ("Dr. Benheim"), Correction Officer ("C.O.") Richard Ulysse ("Ulysse"), C.O. Damon Travis ("Travis"), C.O. Ryan Whelan ("Whelan"), and Sergeant Fred Nameth ("Nameth") (collectively, "Defendants"). Plaintiff, who sues Defendants both individually and in their official capacities, alleges that Defendants violated his constitutional rights and committed state-law torts against him. Before the Court is Defendants' Motion To Dismiss (the "Motion"). (*See* Not. of Mot. (Dkt. No. 32).)

For the following reasons, the Motion is granted in part and denied in part.

## I.  Background

### A.  Factual Background

The following facts are drawn from Plaintiff's Amended Complaint and the exhibits attached to it, (Am. Compl. (Dkt. No. 15)), and are taken as true for the purpose of resolving the instant Motion.

On February 21, 2014, Plaintiff was incarcerated at Downstate Correctional Facility ("Downstate").  (Am. Compl. ¶ 1.)[1]  At about 9:15 a.m. that day, Plaintiff was in his cell when Defendant Ulysse and an unnamed porter came to collect Plaintiff's laundry.  (*Id.* ¶¶ 1–2.)  The porter "handed [P]laintiff a pen to write his initials on his clothing," which Plaintiff did.  (*Id.* ¶¶ 2–3.)  However, when Plaintiff "attempted to return the pen," Ulysse "grabbed and strong-armed [P]laintiff's right hand in a[n] aggressive stronghold[,] causing [P]laintiff's wrist to swell and become numb."  (*Id.* ¶ 3.)  Ulysse further "squeez[ed]" Plaintiff's "right hand and aggressively pull[ed] [his] arm out of the hole in the door until [his] elbow reached the outer edge of the hole."  (*Id.* ¶ 4.)  Although Plaintiff "hopelessly begged" Ulysse to stop and "screamed for help," Ulysse did not stop and instead "braced his foot/feet up against the cell door using both hands to get a better grip on" Plaintiff's hand, causing further pain.  (*Id.* ¶¶ 4–5.)  Ulysse thereafter "became more violent and aggressive," "intentionally pull[ed]" Plaintiff's "entire right arm out of the hole on the cell door until [his] body was pressed up against the cell door," and "aggressively twisted and yanked [his] right arm in a downward violent motion[,] causing more damage and severe pain," as well as numbness.  (*Id.* ¶¶ 6–8, 40.)  Plaintiff "struggled with" Ulysse for "approximately four more minutes before surrendering his arm."

---

[1] Plaintiff's filings in this case contain both numbered and unnumbered paragraphs. Where not possible to cite to the numbered paragraph, the Court cites to the ECF-generated page numbers stamped at the top right-hand corner of the document.

(*Id.* ¶ 8.)  Ulysse thereafter released Plaintiff's arm and "walked way laughing."  (*Id.* ¶ 9.)

Plaintiff "screamed for help in pain" and "requested emergency medical attention" for twenty minutes.  (*Id.* ¶¶ 9, 41.)  Plaintiff was then escorted to Nameth's office.  (*Id.* ¶ 9.)  Nameth questioned Plaintiff (and two nearby inmates) about the incident.  (*Id.* ¶ 10.)  Plaintiff requested that "the investigation be postponed so that [he] can receive medical attention," but Nameth "denied [the] request and stated: 'You have to answer these questions first.'"  (*Id.*)  Plaintiff alleges the questioning caused a delay in his "emergency medical needs" and caused his "right hand and mid-area of the arm to swell."  (*Id.* ¶¶ 10–11, 41–42.)

After "[a]fter a period of twenty minutes or so," Plaintiff was taken to the medical unit.  (*Id.* ¶ 12.)  X-rays and photographs were taken of the injury.  (*Id.*)  Defendant Dr. Benheim, in examining Plaintiff, "grabbed" his "left arm and attempted to put [his] right arm in a medical sling," despite Plaintiff's complaints.  (*Id.* ¶¶ 13, 42.)  Dr. Benheim "forced" Plaintiff to lie down "by picking [him] up by the legs" and pushing his "upper body down on the bed."  (*Id.* ¶ 14.)  He then attached an IV with an "unknown narcotic" to Plaintiff's arm without asking Plaintiff's permission or whether he was allergic to it.  (*Id.* ¶¶ 15–16.)  Plaintiff "begged" Dr. Benheim not to touch him and asked for another doctor, but that request was refused.  (*Id.* ¶ 15.)  Plaintiff "immediately" began to "sweat, feel cold, have trouble breathing, feel dizzy, [feel] panic-struck, [feel] naus[eous] and hallucinate," have "short epileptic episodes," and feel "half his body numbed, frozen and the other half in great pain."  (*Id.* ¶¶ 17, 19.)  Dr. Benheim injected Plaintiff with "another dose of an unknown narcotic," causing Plaintiff pain from the needle — which was inserted "carelessly" into his injured arm — and causing Plaintiff to become "incoherent" and "unresponsive" and to have "blurry vision."  (*Id.* ¶¶ 18, 40.)

Plaintiff was then referred to an outside hospital for further treatment.  (*Id.* ¶ 24.)

Defendants Travis and Whelan, responsible for transporting Plaintiff to the van that would take him to the hospital, "aggressively grabbed [his] arms, pulling both arms towards [his] back," and placed him in "mechanical restraints." (*Id.* ¶¶ 19, 40–41.) This caused Plaintiff pain, who "tried to speak but was unable to [do so] because of the narcotic effects" of the medicine given to him by Dr. Benheim. (*Id.* ¶ 20.) Instead, Plaintiff cried and moaned to signal his distress. (*Id.*) Travis and Whelan carried Plaintiff to the van instead of putting Plaintiff in a "medical mobile bed or portable carry stretcher," and, in placing him in the van, failed to fasten a seat belt around him. (*Id.*) Before they left for the hospital, Whelan smoked a cigarette, causing Plaintiff "to have trouble breathing." (*Id.* ¶ 21.) Further, the van door was left open, causing Plaintiff, who "did not have on a winter coat," to "nearly experience[] hypothermia" and to begin "crying, moaning, shivering, coughing, and breathing very fast." (*Id.*) When the van door was closed, Plaintiff was left "restrained in an uncomfortable[,] painful position with no air circulating[,] leaving [him] to inhale" Whelan's cigarette smoke for about fifteen minutes. (*Id.* ¶ 22.) Plaintiff then "vomited twice and then blacked out" in the van, and "woke up on the van floor and was unable to get up or move" because of the "ongoing effects of the unknown narcotic and being restrained by" handcuffs. (*Id.* ¶ 23.) Plaintiff was "incoherent and unresponsive" upon arrival at the hospital. (*Id.* ¶¶ 23–24.) Following the visit to the hospital, Plaintiff was transported by Travis and Whelan back to Downstate "in the same negligent manner" as before. (*Id.* ¶ 24.)

Upon return to Downstate, Plaintiff was placed in involuntary protective custody ("IPC") without a bed, chair, food, or water, thus forcing him to sit "on the edge of a windowsill" and sleep "in an uncomfortable position." (*Id.* ¶ 25.) From February 22–24, 2014, Plaintiff repeatedly asked Dr. Benheim for a medical shower, but was denied one without explanation, causing him to develop a foot fungus. (*Id.* ¶¶ 26–27, 43.)

On February 24, 2014, Plaintiff was released back into Downstate's general population and given an ace bandage to "keep [his] right arm in a comfortable position." (*Id.* ¶ 28.) Upon return to his cell, he wrote a letter to Defendant Perez complaining about the assault and medical treatment and requesting to be moved to another facility "because [he] feared that he would be assaulted and retaliated against by all defendants mentioned in this complaint." (*Id.* ¶ 29; *see also* Am. Compl. Ex. C1 (letter to Perez).)

On February 26, 2014, Defendant Ulysse approached Plaintiff in the mess hall "during lunch chow" and "verbally threatened" him to not "file a grievance or he would retaliate and make sure other officers in any facility [P]laintiff is transferred to retaliate [against him] as well." (Am. Compl. ¶ 30.) Ulysse further forced Plaintiff to "remove his ace-bandage off his right arm and hand it over." (*Id.* ¶¶ 30–31.) Plaintiff "filed a grievance about the assault, retaliation, negligence[,] and mess hall encounter with" Ulysse. (*Id.* ¶ 31; *see also* Am Compl. Ex. C2 (grievance regarding incident).) Plaintiff made several requests for medical care between February 26 and March 3, 2014, but received no response. (Am Compl. ¶ 32.)

On March 4, 2014, Plaintiff was transferred to Great Meadow Correctional Facility ("Great Meadow"). (*Id.* ¶ 33.) Upon arrival, he was told by another inmate that there was a note stating that Plaintiff "was an asshole, litigant[,] and grieving threat[,] and [giving] an order to destroy all of [his] property." (*Id.* ¶ 34.) On March 6, 2014, Plaintiff was issued a misbehavior report by a prison officer not named as a Defendant here, which Plaintiff alleges was false and an act of retaliation on behalf of Ulysse. (*Id.* ¶¶ 35–36, 44; *see also* Am. Compl. Ex. D6 (misbehavior report).)

B.  Procedural Background

Plaintiff signed his initial Complaint and handed it to prison officials for mailing on

January 18, 2017.  (*See* Compl. 55 (Dkt. No. 2).)  Plaintiff completed his request to proceed

without prepayment of fees, that is, in forma pauperis ("IFP"), on the same day.  (*See* Dkt. No.

1.)  The Court received Plaintiff's initial complaint and IFP request on February 22, 2017.  (*See*

Dkt. (dates associated with entries at Dkt. Nos. 1, 2).)  On February 23, 2017, the Court granted

Plaintiff's IFP request.  (Dkt. No. 4.)

Plaintiff's initial Complaint named Perez and several John Does as Defendants.  (*See*

Compl. 1–2.)  On March 2, 2017, the Court issued an Order directing service on Perez and

directing the New York State Attorney General's Office to identify the John Doe Defendants.

(Dkt. No. 6.)  Perez was thereafter served, and the identities of the John Doe Defendants

ascertained.  (Dkt. Nos. 10–12.)

On June 23, 2017, Plaintiff filed the instant Amended Complaint.  (Am. Compl.)  The

Court issued a second Order directing service, (Dkt. No. 16), and the remaining Defendants were

thereafter served, (Dkt. Nos. 17, 18, 19, 20, 21).  On January 25, 2018, Defendants filed a letter

seeking a pre-motion conference in anticipation of filing a motion to dismiss.  (Dkt. No. 27.)  On

February 5, 2018, the Court set a briefing schedule.  (Dkt. No. 28.)  Defendants filed the instant

Motion To Dismiss and accompanying papers on March 5, 2018.  (*See* Not. of Mot.; Mem. of

Law in Supp. of Mot. ("Defs.' Mem.") (Dkt. No. 31).)  On May 8, 2018, Plaintiff filed a

response in opposition.  (*See* Pl.'s Mem. of Law in Opp'n to Mot. ("Pl.'s Mem.") (Dkt. No. 35).)

On May 21, 2018, Defendants filed a reply.  (*See* Defs.' Reply Mem. of Law in Further Supp. of

Mot. ("Defs.' Reply") (Dkt. No. 36).)

## II.  Discussion

Defendants move to dismiss the Amended Complaint pursuant to Federal Rules of Civil

Procedure 8 and 12(b)(6).  (*See generally* Defs.' Mem.)

A.  Rule 8

Federal Rule of Civil Procedure 8 provides, as relevant here, that "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and that "[e]ach allegation must be simple, concise, and direct," *id.* at 8(d)(1).  Nonetheless, Rule 8 also provides that "[n]o technical form is required" to comply with the rules, *id.*, and that "[p]leadings must be construed so as to do justice," *id.* at 8(e).

In Defendants' view, the Amended Complaint runs afoul of Rule 8 because it is "long and rambling and a total of 131 pages," "contains broad sweeping and conclusory allegations, many of which not directed to any particular party," and "is accompanied with exhibits that are unrelated to the allegations."  (Defs.' Mem. 6–7 (relying in part on *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988)); *see also* Defs.' Reply 1–2 (arguing that the Amended Complaint "contains extraneous facts about non-parties," contains repetitions, and references documents and events that do not involve any Defendant).

While the Court is sympathetic to Defendants' view of the Amended Complaint, Plaintiff has not violated Rule 8.  "The fundamental command of the Federal Rules of Civil Procedure is never to exalt form over substance."  *Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338, 343 (2d Cir. 2006) (citation and quotation marks omitted).  When enforcing technical requirements on litigants, courts are always mindful of the "jurisprudential preference for adjudication of cases on their merits rather than on the basis of formalities."  *Salahuddin*, 861 F.2d at 42; *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002) ("The liberal notice pleading of Rule 8(a) is the starting point of a simplified pleading system, which was adopted to focus litigation on the merits of a claim."); *cf. Wynder v. McMahon*, 360 F.3d 73, 80 (2d Cir.

2004) (noting that "form matters in our system of adjudication," but holding that the complaint "[was] not so lacking in form as to warrant dismissal" (citation and quotation marks omitted)). In this context, "dismissal of a pro se claim as insufficiently pleaded is appropriate only in the most unsustainable of cases," *Boykin v. KeyCorp*, 521 F.3d 202, 216 (2d Cir. 2008) (italics omitted), and it "is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised," *Kittay v. Kornstein*, 230 F.3d 531, 541 (2d Cir. 2000) (quoting *Salahuddin*, 861 F.2d at 42).

Therefore, instead of mechanically determining whether a complaint's allegations are "short and plain" or "simple, concise, and direct," Fed. R. Civ. P. 8(a)(2), (d)(1), the Court considers more broadly whether the complaint gives "fair notice" to the defendants, *Salahuddin*, 861 F.2d at 42; *see also Simmons v. Abruzzo*, 49 F.3d 83, 86 (2d Cir. 1995) ("The function of pleadings under the Federal Rules is to give fair notice of the claim asserted." (citation and quotation marks omitted)); *Amron*, 464 F.3d at 343 ("A complaint need only 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" (quoting *Swierkiewicz*, 534 U.S. at 513)); *Wynder*, 360 F.3d at 79 ("The key to Rule 8(a)'s requirements is whether adequate notice is given." (citation omitted)). "Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial." *Simmons*, 49 F.3d at 86 (citation and quotation marks omitted). Thus, the Court will not dismiss a complaint that may be prolix or even unintelligible unless the complaint's form or substance prevents the defendant from forming a "fair understanding" of the plaintiff's allegations or otherwise prejudices the defendant in responding to the complaint. *Kittay*, 230 F.3d at 542; *see also Amron*, 464 F.3d at 343 ("Dismissal is improper on technical pleading irregularities, which are excusable as long as

they neither undermine the purpose of notice pleading nor prejudice the adverse party." (citation and quotation marks omitted)); *Phillips v. Girdich*, 408 F.3d 124, 130 (2d Cir. 2005) ("Although [the plaintiff's] allegations were not neatly parsed and included a great deal of irrelevant detail, that is not unusual from a pro se litigant. As long as his mistakes do not prejudice his opponent, a plaintiff is entitled to trial on even a tenuous legal theory, supported by the thinnest of evidence." (citations omitted)).

Here, the Amended Complaint provides Defendants fair notice of the claims against them and therefore satisfies the short-and-plain-statement requirement of Rule 8. The Amended Complaint contains each of the usual sections, including a list of the Parties and their addresses, (Am. Compl. 1–3); a description of each Defendant, (*id.* at 4–6); a statement on jurisdiction and venue, (*id.* at 6); a chronological description of the alleged facts and a statement of claims, (*id.* at 7–24); a description of each count, (*id.* at 25–43); a description of Plaintiff's injuries, (*id.* at 48); and a statement as to the relief sought, (*id.* 49–52). Indeed, the Amended Complaint usefully contains a statement on Plaintiff's attempts at exhaustion, (*id.* at 44–46), and on Plaintiff's previous lawsuits, (*id.* at 47). Throughout, the Amended Complaint uses numbered pages and paragraphs, and it contains neat, orderly, easy-to-read handwriting. Therefore, even if some portions of the Amended Complaint "contain[] a number of arguably confusing or irrelevant paragraphs," and contain sections that are repetitive and certain exhibits whose relevance may not be apparent, "the Court cannot say that the . . . Amended Complaint fails to put . . . Defendants on fair notice of Plaintiff's claims." *Ong v. Park Manor (Middletown Park) Rehab. & Healthcare Ctr.*, 51 F. Supp. 3d 319, 346 (S.D.N.Y. 2014); *see also Kittay*, 230 F.3d at 542 (finding that a complaint satisfied Rule 8 where the "allegations [were] sufficiently clear to have provided [the defendant] with a fair understanding of what the plaintiff [was] complaining about

and to have allowed [the defendant] to know whether there is a legal basis for recovery" (citation and quotation marks omitted)).

### B.  Rule 12(b)(6)

#### 1.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, quotation marks, and alterations omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Id.* (quotation marks and alteration omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff need allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R.

Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering a motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the sufficiency of a complaint we accept as true all factual allegations . . . ." (quotation marks omitted)). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Where, as here, a plaintiff proceeds pro se, the "complaint[] must be construed liberally and interpreted to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and quotation marks omitted)).

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks and citation omitted). When a plaintiff proceeds pro se, however, the Court may consider

"materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted), including "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted), statements by the plaintiff "submitted in response to [a] defendant's request for a pre-motion conference," *Jones v. Fed. Bureau of Prisons*, No. 11-CV-4733, 2013 WL 5300721, at *2 (E.D.N.Y. Sept. 19, 2013), and "documents that the plaintiff[] either possessed or knew about and upon which [the plaintiff] relied in bringing the suit," *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000).

### 2. Analysis

Defendants move to dismiss the Amended Complaint on grounds that the claims are time-barred; that Plaintiff failed to exhaust administrative remedies; that Plaintiff fails to allege the personal involvement of Defendant Perez; that Plaintiff fails to allege an Eighth Amendment claim; that Plaintiff fails to allege a First Amendment retaliation claim; that the claims against Defendants in their official capacities must be dismissed under the Eleventh Amendment; and that Defendants are entitled to qualified immunity. (*See* Defs.' Mem. 7–22.) The Court addresses each argument separately to the extent necessary.

### a. Statute of Limitations

### i. Section 1983 Claims

Defendants argue that Plaintiff's § 1983 claims relating to the events of February 21, 2014 are time-barred. (*See* Defs.' Mem. 7.) "In [§] 1983 actions, the applicable limitations period is found in the 'general or residual state statute of limitations for personal injury actions.'" *Ormiston v. Nelson*, 117 F.3d 69, 71 (2d Cir. 1997) (alterations omitted) (quoting *Owens v.*

*Okure*, 488 U.S. 235, 249–50 (1989)).  Here, New York's three-year statute of limitations for personal injury actions applies.  *See* N.Y. C.P.L.R. § 214(5); *see also, e.g.*, *Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002) (holding that, because § 1983 does not contain a specific statute of limitations, courts apply the statute of limitations for personal injury actions under state law, which in New York is three years (citing N.Y. C.P.L.R. § 214(5))).  Therefore, in Defendants' view, Plaintiff's § 1983 claims relating to the events of February 21, 2014 are time-barred because he did not file his initial Complaint until February 22, 2017, one day following the expiration of the statute of limitations.  (*See* Defs.' Mem. 8.)

This is incorrect as a matter of law.  Under the prison mailbox rule, an inmate's complaint is deemed filed on the day it is handed to prison officials for mailing.  *See Allen v. N.Y.C. Dep't of Corr.*, No. 06-CV-7205, 2010 WL 1644943, at *7 (S.D.N.Y. Mar. 17, 2010) (citing *Dory v. Ryan*, 999 F.2d 679, 682 (2d Cir. 1993)).  Here, Plaintiff signed his initial Complaint on January 18, 2017.  (*See* Compl. 55.)  "Although it is not clear when [Plaintiff] gave his complaint to prison officials, absent evidence to the contrary, the Court assumes that [Plaintiff] gave [it] to prison officials for mailing on the date he signed it."  *Johnson v. Coombe*, 156 F. Supp. 2d 273, 277 (S.D.N.Y. 2001) (citation, quotation marks, and original alterations omitted).  Therefore, Plaintiff's initial Complaint was timely filed over a month prior to the expiration of the statute of limitations.

### ii.  State Law Claims

Defendants also argue that Plaintiff's state-law claims are time-barred.  (*See* Defs.' Mem. 9–10.)  "The accrual of pendant state law tort claims . . . in federal court actions is governed by state law."  *Mitchell v. Home*, 377 F. Supp. 2d 361, 377 (S.D.N.Y. 2005).  In New York, the statute of limitations for intentional torts is one year.  *See* N.Y. C.P.L.R. § 215(3).  Plaintiff's

Amended Complaint alleges state-law intentional torts occurring between February 21, 2014 and about March 6, 2014. (*See generally* Am. Compl.) Plaintiff's initial Complaint was not mailed until January 18, 2017. Therefore, Plaintiff's state-law claims are time-barred and must be dismissed with prejudice.

### b. Exhaustion

Defendants argue that Plaintiff's § 1983 claims are barred for failure to exhaust administrative remedies. (*See* Defs.' Mem. 7–9.)

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under [§] 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This "language is 'mandatory': An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) (citation omitted). The exhaustion requirement applies to "all inmate suits about prison life," *Porter v. Nussle*, 534 U.S. 516, 520, 532 (2002), and includes actions for monetary damages even if monetary damages are not available as an administrative remedy, *see Booth v. Churner*, 532 U.S. 731, 741 (2001). Moreover, the PLRA "requires proper exhaustion, which means using all steps that the prison grievance system holds out." *Williams v. Priatno*, 829 F.3d 118, 122 (2d Cir. 2016) (citations, quotation marks, and alteration omitted). Indeed, the PLRA demands "strict compliance with the grievance procedure . . . , or else dismissal must follow inexorably." *McCoy v. Goord*, 255 F. Supp. 2d 233, 246 (S.D.N.Y. 2003) (citations, quotation marks, and alteration omitted).

However, the PLRA contains a "textual exception to mandatory exhaustion." *Ross*, 136

S. Ct. at 1858. "[T]he exhaustion requirement hinges on the 'availab[ility]' of administrative remedies: An inmate . . . must exhaust available remedies, but need not exhaust unavailable ones." *Id.* Available "grievance procedures . . . are capable of use to obtain some relief for the action complained of." *Id.* at 1859 (citation and quotation marks omitted). In *Ross*, the Supreme Court identified "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* An administrative remedy is unavailable: (1) where "it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where the procedure is "so opaque that it becomes, practically speaking, incapable of use" such that "no ordinary prisoner can discern or navigate it"; or (3) where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859–60. It bears noting, however, that the "three circumstances discussed in *Ross* do not appear to be exhaustive," *Williams*, 829 F.3d at 123 n.2, but rather "guide the Court's inquiry," *Khudan v. Lee*, No. 12-CV-8147, 2016 WL 4735364, at *5 (S.D.N.Y. Sept. 8, 2016) (citation omitted).

Finally, failure to exhaust is an affirmative defense, not a pleading requirement. *See Jones v. Bock*, 549 U.S. 199, 216 (2007); *Grullon v. City of New Haven*, 720 F.3d 133, 141 (2d Cir. 2013). "Inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones*, 549 U.S. at 216. Accordingly, "dismissal is appropriate on a motion to dismiss where failure to exhaust is clear on the face of the complaint." *Brinson v. Kirby Forensic Psych. Ctr.*, No. 16-CV-1625, 2018 WL 4680021, at *6 (S.D.N.Y. Sept. 28, 2018) (citation omitted); *see also McCoy*, 255 F. Supp. 2d at 249 (same).

The grievance program applicable here is the New York State Department of Corrections

and Community Supervision ("DOCCS") Inmate Grievance Program ("IGP").[2] *See* 7

N.Y.C.R.R. § 701 *et seq.* The IGP provides for a three-step grievance process. The inmate must

first submit a written grievance to the Inmate Grievance Review Committee ("IGRC"). *See*

*Gayot v. Perez*, No. 16-CV-8871, 2018 WL 6725331, at *6 (S.D.N.Y. Dec. 21, 2018) (citing 7

N.Y.C.R.R. § 701.5(a)). "If the IGRC's determination is adverse to the inmate, at the second

step the inmate may appeal to the superintendent within seven calendar days." *Id.* (citing 7

N.Y.C.R.R. § 701.5(c)). "And if the superintendent's determination is adverse to the inmate, at

the third and final step the inmate may appeal to the Central Office Review Committee

("CORC") within seven calendar days." *Id.* (citing 7 N.Y.C.R.R. § 701.5(d)). Only after

completing all three steps of the IGP may suit be brought. *See Williams*, 829 F.3d at 122.

In the Amended Complaint, Plaintiff states that he "has continued to [pursue] all

complaints and exhaust all administrative remedies," (Am. Compl. ¶ 38), that he "filed

grievances" at Downstate and Great Meadow with regard to his claims, (*id.* at 44–45), and that

he "appealed all complaints to the [relevant] Superintendent" and "appealed further to the

[CORC]," (*id.*). Plaintiff also acknowledges, however, that "some complaints, grievances[,] and

appeals were never addressed or acknowledged by [DOCCS]," that "some complaints did not

meet [DOCCS] deadlines because [they were] destroyed or missing from acts of retaliation," and

that "[s]ome complaints were never filed due to the long history of harassment, threats, fear of

plaintiff's life and retaliation from [DOCCS] and [its] employees." (*Id.*) Plaintiff further alleges

that Defendant Ulysse "verbally threatened" him "not to file a grievance or he would retaliate."

---

[2] Plaintiff alleges that the "grievance procedure at [Downstate and Great Meadow] . . . did not cover any of [his] claims." (Am. Compl. 45). This is incorrect. As noted, the exhaustion requirement applies to "all inmate suits about prison life." *Porter*, 534 U.S. at 520, 532.

(*Id.* ¶ 30.)  In short, Plaintiff clarifies, "most of the grievances" were "never processed," some were "destroyed," others were processed but "denied," and some were never filed at all for fear of retaliation.  (*Id.* at 45–46.)

As Defendants point out, (Defs.' Mem. 8), Plaintiff essentially admits that he did not exhaust as required by the PLRA.  Plaintiff attaches no documents to the Amended Complaint demonstrating that he filed grievances or appeals regarding the allegations of February and March 2014 described in the Amended Complaint.  To be sure, Plaintiff does attach copies of several grievances and appeals filed between February 2015 and January 2016, but those refer not to the allegations raised in the Amended Complaint but to separate issues that postdate the events of, and indeed involve a different correctional facility than, alleged in the Amended Complaint.  (*See* Am. Compl. Exs. D16–D18, D24–D41.)[3]  Plaintiff also attaches several letters, written in February–April 2014, May 2016, and December 2016, to Defendant Perez, other officials in the Downstate and Great Meadow grievance departments, and the DOCCS commissioner, describing and complaining about many of the allegations raised in the Amended Complaint.  (*See* Am. Compl. Exs. C1–C2, D8–D11, D44–D46, D49.)  However, these letters are not themselves grievances.  "Numerous courts considering that issue have found that complaints that were not filed as formal grievances cannot satisfy the exhaustion requirement" of the PLRA.  *Collins v. Goodliff*, No. 12-CV-6595, 2014 WL 6065670, at *2 (W.D.N.Y. Nov. 13, 2014) (citation omitted); *see also Scott v. Gardner*, 287 F. Supp. 2d 477, 488–89 (S.D.N.Y. 2003) ("Letters of complaint, regardless of the addressee, are not part of the grievance process and do not satisfy the exhaustion requirement." (citation omitted)); *Houze v. Segarra*, 217 F.

---

[3] Indeed, Plaintiff attaches letters from prison officials stating that no grievances are on file as to the allegations raised in the Amended Complaint.  (*See* Am. Compl. Exs. D11, D12, D42, D47.)

Supp. 2d 394, 395–96 (S.D.N.Y. 2002) (holding that letters to the superintendent asking for an investigation of an alleged assault did not constitute exhaustion); *Beatty v. Goord*, 210 F. Supp. 2d 250, 255–56 (S.D.N.Y. 2000) (holding that "writing letters" to prison medical director, superintendent, and DOCCS commissioner did not constitute exhaustion).

The Amended Complaint and its attached exhibits thus demonstrate that Plaintiff did not exhaust his administrative remedies as required by the PLRA. The question, then, is whether an exception to the exhaustion requirement applies. Plaintiff makes no showing whatsoever that the IGP is a "simple dead end" that is "unable" to provide relief to grievances. *Ross*, 136 S. Ct. at 1859. Nor can it be said that the IGP is "so opaque that it becomes, practically speaking, incapable of use," such that "no ordinary prisoner can discern or navigate it," *id.*, for the Amended Complaint amply demonstrates that Plaintiff filed numerous formal grievances and appeals (albeit about other issues) pursuant to the requirements of the IGP. Therefore, the only possible applicable exception is whether Plaintiff was "thwart[ed]" from using the IGP through prison officials' "machination, misrepresentation, or intimidation," that is, whether prison officials "misled or threatened" Plaintiff to prevent his use of the IGP. *Id.* at 1860.

Here, Plaintiff alleges:

On February 26th[,] 2014, during lunch chow, [P]laintiff was approached by C.O. Ulysse inside the mess[] hall. Mr. Ulysse verbally threatened the [P]laintiff[,] telling [P]laintiff not to file a grievance or he would retaliate and make sure other officers in any facility [P]laintiff is transferred to retaliate as well. Mr. Ulysse also stated "[You're] not going to win with me" and made [P]laintiff remove his ace-bandage off his right arm and hand it over. Plaintiff immediately removed the ace-bandage and handed it to C.O. Ulysse out of fear for his life, safety[,] and to prevent further assaults and retaliation.

(Am. Compl. ¶¶ 30–31.) Plaintiff further explains that, as a result, "some complaints" were "destroyed or missing from acts of retaliation," (*id.* ¶ 38); that "[s]ome complaints were never filed due to the long history of harassment, threats, fear of plaintiff's life and retaliation from

18

[DOCCS] and [its] employees," (*id.*); and that "most of the grievances" were "never processed," some were "destroyed," others were processed but "denied," and some were never filed for fear of retaliation, (*id.* at 45–46).

This allegation, taken as true for purposes of this Motion, is, if barely, sufficiently "specific and clear" because the alleged threat "relates directly to Plaintiff's prospective grievance against" Ulysse. *White v. Westchester County*, No. 18-CV-730, 2018 WL 6726555, at *7 (S.D.N.Y. Dec. 21, 2018). Plaintiff explains "with particularity" when and where Ulysse threatened him. *Id.* Plaintiff further indicates that Ulysse's threat was directly related to the February 2014 incident and to the possibility that a grievance would be filed against him. Plaintiff also connects Ulysse's threat to another act of intimidation and retaliation, namely, the taking of Plaintiff's bandage. Moreover, context suggests that Plaintiff was in fact intimidated by Ulysse's threat. Two days prior to Ulysse's threat, Plaintiff wrote a letter to Perez complaining about Ulysse's assault. (*See* Am. Compl. Ex. C1.) And following Ulysse's threat, Plaintiff filed numerous formal grievances relating to other issues. (*See* Am. Compl. Exs. D16–D18, D24–D41.) Yet, despite taking these actions, Plaintiff did *not* file a formal grievance against Ulysse relating to the assault. The Amended Complaint thus indicates that Ulysse threatened Plaintiff not to file a grievance against him and that the threat had its intended effect. Therefore, Plaintiff alleges sufficient facts that satisfy, at least at the motion-to-dismiss stage, the third *Ross* exception. *Cf. Jackson v. Downstate Corr. Facility*, No. 16-CV-267, 2018 WL 3650136, at *6 (S.D.N.Y. July 31, 2018) (holding no exception to exhaustion existed where the alleged threat was "wholly unsupported by any evidence and [was] conclusory insofar as [the] [p]laintiff point[ed] to no facts regarding such intimidation"); *Medina v. Kaplan*, No. 16-CV-7223, 2018 WL 797330, at *5 (S.D.N.Y. Feb. 8, 2018) ("Conclusory allegations of intimidation

are insufficient to establish the unavailability of administrative remedies. . . . There is no allegation that the threat was even related to [the plaintiff's] grievance and ability to exhaust available administrative relief." (citation omitted)).[4]

Accordingly, although Plaintiff failed to complete any of the steps of the IGP with respect to the allegations contained in the Amended Complaint, an exception to the exhaustion requirement plausibly applies. This ruling is without prejudice to Defendants raising this issue in a summary judgment motion.

### c. Personal Involvement of Defendant Perez

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation." *Grullon*, 720 F.3d at 138. To establish personal involvement, a plaintiff must show that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 139 (citation, italics and quotation marks omitted). In other words, "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. Therefore, Plaintiff must plausibly allege that Defendant Perez's actions fall

---

[4] The Court further notes that Defendants focus solely on the question whether Plaintiff completed exhaustion, and fail entirely to address the question whether any exception to exhaustion applies. (*See* Defs.' Mem. 9–10; Defs.' Reply 2–3.)

into one of the five categories identified above. *See Lebron v. Mrzyglod*, No. 14-CV-10290,

2017 WL 365493, at *4 (S.D.N.Y. Jan. 24, 2017) (holding that the five categories "still control[]

with respect to claims that do not require a showing of discriminatory intent" post-*Iqbal*).

Plaintiff does not allege that Defendant Perez herself committed, or "participated

directly" in, the alleged assault and inadequate medical care or that Perez "created a policy or

custom" enabling those allegations. *Grullon*, 720 F.3d at 139. Plaintiff alleges only that

Defendant Perez did not respond to a letter, sent on February 24, 2014, "complaining about the

assault [and] negligence and request[ing] to be moved to another complex or facility because

Plaintiff feared that he would be assaulted and retaliated against by all [D]efendants mentioned

in this [Amended] [C]omplaint." (Am. Compl. ¶ 29.) The letter states:

> On Feb. 21, 2014, around 9:15 a.m., I was attacked and assaulted by a[n] officer
> for no reason. The officer ignored my request for medical attention and showed no
> remorse for his actions. The medical department also treated me unfair and
> neglected me. There [were] two officers who took me to the hospital and both
> officers also mistreated me, neglected my medical needs, injuries[,] and health. I
> feel like this entire facility['s] staff members and officers are disrespecting,
> harming[,] and mistreating me because of the assault against me. Why was I placed
> back in this cell knowing there is a possibility that my attacker can harm me
> again[?] I don't want to be in this complex or jail. Can I please be moved away to
> another location to avoid future attacks and mistreatment[?]

(Am. Compl. Ex. C1.) This letter suggests a "gross negligence," "failure to remedy," or

"deliberate indifference" theory of personal involvement. (*See* Pl.'s Mem. 7.) Yet, Plaintiff

states that, "[o]n March 3rd, 2014, [P]laintiff was placed on a draft and drafted the next day . . .

to Great Meadow Correctional Facility." (Am. Compl. ¶ 33.) And Plaintiff attaches a letter, sent

by another prison official on behalf of Perez, stating: "You are currently in Reception status.

When your classification is complete, you will be transferred to a facility that will meet your

identified needs." (Am. Compl. Ex. D5.) In other words, Plaintiff alleges that, less than two

weeks after requesting a facility transfer from Perez, he both received a response and was in fact

transferred. It therefore cannot be said either that Perez failed to address Plaintiff's request, that Perez was deliberately indifferent to Plaintiff's complaint, or that Perez was grossly negligent in supervising subordinates in responding to Plaintiff's request. *See Thompson v. Booth*, No. 16-CV-3477, 2018 WL 4760663, at *7 (S.D.N.Y. Sept. 28, 2018) (holding no personal involvement where "[t]here is no allegation that [a defendant] failed to act on information regarding the [allegedly] unlawful conduct or otherwise acted with gross negligence" (third alteration in original) (citation and quotation marks omitted)). Accordingly, Plaintiff fails to allege Perez's personal involvement in the alleged constitutional violations raised in the Amended Complaint.

### d. Eighth Amendment Claims Against Dr. Benheim, Nameth, Travis, and Whelan[5]

"The Eighth Amendment forbids 'deliberate indifference to serious medical needs of prisoners.'" *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). An inmate's claim of deliberate indifference to his medical needs by those overseeing his care is analyzed under the Eighth Amendment because it is an allegation that "conditions of confinement [are] a form of punishment" and thus is a "violation of [the] Eighth Amendment right to be free from cruel and unusual punishments." *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017). To state a deliberate indifference claim, Plaintiff must plausibly allege (1) "that he suffered a sufficiently serious constitutional deprivation," and (2) that Defendants "acted with deliberate indifference." *Feliciano v. Anderson*, No. 15-CV-4106, 2017 WL 1189747, at *8 (S.D.N.Y. Mar. 30, 2017).

The first element is "objective" and requires Plaintiff show that the "alleged deprivation of adequate medical care [is] sufficiently serious." *Spavone*, 719 F.3d at 138 (citation and

---

[5] Defendants do not move to dismiss Plaintiff's Eighth Amendment claim against Ulysse.

quotation marks omitted). In other words, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (citing *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Analyzing this objective requirement involves two inquiries: "whether the prisoner was actually deprived of adequate medical care," and "whether the inadequacy in medical care is sufficiently serious," which in turn "requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin v. Goord*, 467 F.3d 263, 279–80 (2d Cir. 2006). "There is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003). Nevertheless, the Second Circuit has offered the following non-exhaustive list of factors to consider when evaluating an inmate's medical condition: "(1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment, (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Id.* (citation and quotation marks omitted).

The second element, which goes to mental state, requires Plaintiff show that the prison officials were "subjectively reckless in their denial of medical care." *Spavone*, 719 F.3d at 138 (citation omitted). This means that the official must have "appreciate[d] the risk to which a prisoner was subjected," and have had a "subjective awareness of the harmfulness associated with those conditions." *Darnell*, 849 F.3d at 35; *see also Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014) ("Deliberate indifference is a mental state equivalent to subjective recklessness," and it "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." (citation and quotation marks omitted)). In other words,

"[i]n medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Id.* (citation and quotation marks omitted). An official's awareness of the risk of serious harm can be established through "inference from circumstantial evidence," including "from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). However, "mere negligence" is insufficient to state a claim for deliberate indifference. *Walker*, 717 F.3d at 125 (quoting *Farmer*, 511 U.S. at 835). Neither does "mere disagreement over the proper treatment . . . create a constitutional claim," and accordingly, "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998).

### i. Dr. Benheim

Defendants argue that Plaintiff's inadequate deliberate indifference claim is nothing more than a non-actionable disagreement with the treatment provided to him by Dr. Benheim. (Defs.' Mem. 13.) The Court agrees. The Amended Complaint and accompanying attachments show that, on February 21, 2014, following the alleged assault by Ulysse, Plaintiff was taken to the medical unit, where x-rays and photographs were taken of the injury (although it is unclear by whom). (Am. Compl. ¶ 12.) Dr. Benheim then "grabbed" Plaintiff's "left arm and attempted to put [his] right arm in a medical sling," ignoring Plaintiff's complaints, (*id.* ¶¶ 13, 42), and "forced" Plaintiff to lie down by picking him up by the legs and pushing his upper body down on the bed, (*id.* ¶ 14). Plaintiff "begged" Dr. Benheim "not to touch" him and "requested the service of a different physician and to be taken to an outside hospital." (*Id.* ¶ 15.) Dr. Benheim "ignored" Plaintiff and attached an IV with an "unknown narcotic" to Plaintiff's arm without

asking for Plaintiff's consent or whether he was allergic to it. (*Id.* ¶¶ 15–16.)[6] The IV "immediately" caused Plaintiff to "sweat, feel cold, have trouble breathing, feel dizzy, [feel] panic-struck, [feel] naus[eous] and hallucinate," have "short epileptic episodes," and feel "half his body numbed, frozen and the other half in great pain." (*Id.* ¶¶ 17, 19.) Dr. Benheim then injected Plaintiff with "another dose of an unknown narcotic," causing Plaintiff pain from the needle — which was inserted "carelessly" into his injured arm — and causing Plaintiff to become "incoherent" and "unresponsive" and to have "blurry vision." (*Id.* ¶¶ 18, 40.) Dr. Benheim then referred Plaintiff for a consultation at an outside hospital. (*Id.* ¶ 24; *see also* Am. Compl. Exs. B1–B2.)

These allegations show that Dr. Benheim did not ignore Plaintiff's medical needs or deny Plaintiff medical care. Rather, within about an hour of Plaintiff's injury, Dr. Benheim conducted an examination of Plaintiff's arm and shoulder, treated him with pain medication, and, having taken contemporaneous notes as to Plaintiff's condition and possible diagnosis, referred Plaintiff for further treatment. (*See* Am. Compl. Exs. B2–B3.) Although Plaintiff sharply disagreed with Dr. Benheim's treatment at the time and now alleges that he had an adverse reaction to the medication administered, Plaintiff essentially alleges "negligence amounting to medical malpractice," which is "insufficient to state a claim of deliberate indifference." *Whitley v. Ort*, No. 17-CV-3652, 2018 WL 4684144, at *8 (S.D.N.Y. Sept. 28, 2018) (citations omitted); *see also Chance*, 143 F.3d at 703 (noting that "mere disagreement over the proper treatment" is insufficient, provided that "the treatment given is adequate"); *Melvin v. County of Westchester*, No. 14-CV-2995, 2016 WL 1254394, at *7 (S.D.N.Y. Mar. 29, 2016) (holding that "treatment of

---

[6] Medical records attached to the Amended Complaint show that Plaintiff was administered Toradol, a non-steroidal anti-inflammatory drug. (*See* Am. Compl. Exs. D1–D2.)

a prisoner's medical condition generally defeats a claim of deliberate indifference" (citation and quotation marks omitted)). Accordingly, Plaintiff fails to satisfy either element required to state an Eighth Amendment deliberate indifference claim.

Further, to the extent Plaintiff alleges that Dr. Benheim improperly denied him a medical shower from February 22–24, 2014, (Am. Compl. ¶¶ 26–27), such a claim does not rise to the level of an Eighth Amendment violation. "Courts in this circuit routinely reject conditions-of-confinement claims based on the temporary denial of showers." *Williams v. Ramos*, No. 13-CV-826, 2013 WL 7017674, at *6 (S.D.N.Y. Dec. 23, 2013); *see McCoy*, 255 F. Supp. 2d at 260 (holding that "a two-week suspension of shower privileges does not suffice as a denial of 'basic hygienic needs'"); *Dolberry v. Levine*, 567 F. Supp. 2d 413, 417 (W.D.N.Y. 2008) (holding that the denial of showers for "several weeks" would not constitute an Eighth Amendment violation); *Ramirez v. Holmes*, 921 F. Supp. 204, 208 (S.D.N.Y. 1996) (holding that the denial of a shower on three occasions did not constitute a serious deprivation); *Graham v. Kuhlmann*, No. 88-CV-6618, 1990 WL 210298, at *4 (S.D.N.Y. Dec. 12, 1990) (holding that allowing an inmate one shave and shower per week provided minimally adequate hygiene).

### ii. Nameth

Defendants argue that Plaintiff fails to establish Defendant Nameth's deliberate indifference to Plaintiff's medical needs. (Defs.' Mem. 15–16.) The Court agrees. Plaintiff alleges that, immediately following the alleged assault by Ulysse, he was escorted to Nameth's office "to be questioned about the incident that occurred." (Am. Compl. ¶¶ 10, 41–42.) While being questioned, "Plaintiff complained about is injuries and pain and asked [Nameth] could the investigation be postponed so that [he] can receive medical treatment." (*Id.* ¶ 10.) However, Nameth "denied [his] request and stated: 'You have to answer these questions first.'" (*Id.*) The

delay ultimately lasted "twenty minutes or so," after which Plaintiff was escorted for medical care. (*Id.* ¶ 12.) In Plaintiff's view, Nameth "knew [he] was in great amounts of pain, [yet] did nothing to prevent [his] suffering and disregarded an excessive risk to [his] medical needs." (*Id.* ¶ 42.)

These allegations fail to establish Nameth's deliberate indifference. "[A] delay in treatment does not violate the constitution unless it involves an act or failure to act that evinces a conscious disregard of a substantial risk of serious harm." *Pabon v. Wright*, No. 99-CV-2196, 2004 WL 628784, at *8 (S.D.N.Y. Mar. 29, 2004) (citation and quotation marks omitted), *aff'd*, 459 F.3d 241 (2d Cir. 2006). That is, "denying or delaying needed treatment for a serious medical condition constitutes deliberate indifference for Eighth Amendment purposes only if," for example, "officials delayed care as a form of punishment, ignored a life-threatening and fast-degenerating condition for several days, or delayed major surgery." *Myrie v. Calvo*, 615 F. Supp. 2d 246, 248 (S.D.N.Y. 2009) (citation omitted). Plaintiff makes no allegation that Nameth delayed Plaintiff's treatment in order to punish him; to the contrary, Plaintiff acknowledges that Nameth questioned him for the purpose of investigating the incident. Nor does Plaintiff suggest that Nameth ignored a serious medical condition over a long period of time. Rather, the Amended Complaint shows that Plaintiff received medical treatment less than one hour after the alleged assault, and that Nameth's investigation delayed medical treatment by some twenty minutes. (Am. Compl. ¶¶ 11–12; *see* also Am. Compl. Exs. D1–D4.) Plaintiff alleges that the twenty-minute delay "caus[ed] his right and mid-area of the arm to swell," but there is no allegation that such a delay caused Plaintiff any additional injuries or harm and, indeed, the ensuing x-rays and photographs showed that Plaintiff suffered no fracture and required no serious treatment beyond administration of an anti-inflammatory drug. There is, therefore, "no

evidence that [Nameth] consciously disregarded a substantial risk of serious harm through deliberate delay of treatment." *Pabon*, 2004 WL 628784, at *8; *see also Waller v. DuBois*, No. 16-CV-6697, 2018 WL 1605079, at *7 (S.D.N.Y. Mar. 29, 2018) (dismissing deliberate indifference claim in part because "the alleged delay . . . was minimal"). Accordingly, Plaintiff's deliberate-indifference claim against Nameth is dismissed.

### iii. Travis and Whelan

#### (a) Handcuffing

Plaintiff alleges that Defendants Travis and Whelan, in transporting Plaintiff to an outside hospital for treatment, "aggressively grabbed [his] arms, pulling both arms towards [his] back," placed him in handcuffs, and, because he was "unable to walk," "carried [him] by the arms" to the van rather than placing him in a cart or stretcher. (Am. Compl. ¶¶ 19–20.) Plaintiff contends that Travis and Whelan did so while "highly aware of [his] injuries and disabilities after receiving medical reports that [were] required to be giv[en] to" outside physicians. (*Id.* at 30.) Plaintiff further alleges that, although he "was unable to [speak] because of the narcotic effects," he "showed signs of distress from the restraints by crying and moaning." (*Id.* ¶ 20.) Finally, Plaintiff alleges that, once in the van, he "vomited twice" and "blacked out" in the van, "woke up on the van floor," and "was unable to get up or move" due to "the ongoing effects of the unknown narcotics and being restrained by hand and ankle shackles." (*Id.* ¶ 23.)

Defendants argue that this claim of excessive force is, at most, a de minimis allegation that does not implicate the Eighth Amendment. (*See* Defs.' Mem. 17–18.) The Court agrees. To be sure, overly tight handcuffing can in some circumstances constitute excessive force. *See Kerman v. City of New York*, 261 F.3d 229, 239–40 (2d Cir. 2001). "In evaluating the reasonableness of handcuffing, the Court is to consider evidence that: 1) the handcuffs were

unreasonably tight; 2) the defendants ignored the plaintiff's pleas that the handcuffs were too tight; and 3) the degree of injury to the wrists." *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008) (citation, quotation marks, and alteration omitted). A failure to allege any continuing injury from the handcuffing is "fatal" to a claim of excessive force. *Id.* Put another way, "the use of tightly fastened handcuffs that result in . . . only minor injuries is not an actionable use of excessive force." *Johnson v. City of New York*, No. 09-CV-4685, 2011 WL 1044852, at *4 (S.D.N.Y. Mar. 18, 2011) (citation and quotation marks omitted)); *Blue v. City of New York*, No. 14-CV-7836, 2018 WL 1136613, at *11 (S.D.N.Y. Mar. 1, 2018) ("Generally, handcuffing that does not cause injury beyond temporary discomfort or bruising does not rise to the level of an excessive force claim." (citation omitted)).

Here, Plaintiff alleges that the narcotics administered to him caused him to be "unable to [speak]" and then to "vomit[] twice" and "black[] out" in the van. (Am. Compl. ¶¶ 20, 23.) Yet, the Amended Complaint alleges that Dr. Benheim — not Travis or Whelan — gave Plaintiff the narcotics that caused these injuries, (*see id.* ¶¶ 15–19), and Plaintiff does not otherwise suggest that these injuries are attributable to Travis or Whelan. Plaintiff also alleges that, in being taken to the van, he "showed signs of distress from the [handcuffs] by crying and moaning," (*id.* ¶ 20); that Travis and Whelan "carried [him] by the arms" to the van when he "was unable to walk," (*id.*); and that, upon waking up in the van, he "was unable to get up or move" due to the narcotics and the handcuffs, (*id.* ¶ 23). Yet, Plaintiff does not suggest that these actions caused him a "lasting injury." *Blue*, 2018 WL 1136613, at *11. Accordingly, the Amended Complaint fails to state an Eighth Amendment handcuffing claim.

### (b)  Second-Hand Smoke

Plaintiff alleges that Whelan smoked "a cigarette" while Plaintiff was in the van with the

door open, causing him "to have trouble breathing." (Am. Compl. ¶ 21.) Plaintiff further alleges

that the van door was then closed, causing Plaintiff "to inhale the second hand smoke and

carbon-monoxide for approximately ten to fifteen minutes or so before the van was started up."

(*Id.* ¶ 22.) As Defendants argue, however, (*see* Defs.' Mem. 16–17; Defs.' Reply 7–8), this

claim is a de minimis allegation that does not implicate the Eighth Amendment. The Supreme

Court has stated that, in order to make out an Eighth Amendment claim based on exposure to

second-hand smoke, Plaintiff must show that Defendants "have, with deliberate indifference,

exposed him to levels of [environmental tobacco smoke ("ETS")] that pose an unreasonable risk

of serious damage to his future health." *Helling v. McKinney*, 509 U.S. 25, 35 (1993); *accord*

*Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002); *Johnson v. Goord*, 01-CV-9587, 2005 WL

2811776, at *7 (S.D.N.Y. Oct. 27, 2005) ("The Supreme Court made clear in *Helling* . . . that

inmates do not have an unqualified constitutional right to a smoke-free environment, but only a

right to be free of involuntary exposure to a level of ETS which 'unreasonably endangers' their

future health." (alteration omitted) (quoting *Helling*, 509 U.S. at 35)).

Here, Plaintiff cannot meet this standard. Plaintiff alleges facts that are a far cry from

those in *Helling*, 509 U.S. at 28, in which the Supreme Court declined to grant summary

judgment where the plaintiff shared a cell with someone who smoked five packs of cigarettes per

day. Indeed, the facts alleged by Plaintiff do not come close even to those in which courts have

dismissed ETS-based claims. *See Islam v. Connolly*, No. 07-CV-3225, 2011 WL 723568, at *7–

8 (S.D.N.Y. Feb. 16, 2011) (holding that the plaintiff failed to show that he was being exposed to

unreasonably high levels of ETS where the plaintiff's cell was next to that of a smoker);

*Johnson*, 2005 WL 2811776, at *5 (granting summary judgment where, "unlike in *Helling* . . .

[here the] plaintiffs do not allege that they were forced to share cells with smokers"); *Zaire v.*

*Artuz*, No. 99-CV-9817, 2003 WL 230868, at *5 (S.D.N.Y. Feb. 3, 2003) (granting summary judgment where the plaintiff was only exposed to second-hand smoke in common areas). Nor does Plaintiff allege that he sought treatment for smoke inhalation or that he suffers from a medical condition that makes him especially susceptible to smoke inhalation. *See Enigwe v. Zenk*, No. 03-CV-854, 2007 WL 2713849, at *3 (E.D.N.Y. Sept. 14, 2007) (noting that the plaintiff "has not alleged that he suffers from a medical condition, such as asthma, that was exacerbated by exposure to ETS"). Finally, Plaintiff has made no showing that Travis acted with deliberate indifference; Plaintiff does not allege that he complained to Travis about the smoke or that he suffered from some medical condition, or that Travis otherwise knowingly disregarded Plaintiff's sensitivity to ETS. *See id.* at *6 ("There is no evidence that prison officials were aware that [the plaintiff] was being exposed to unreasonably high levels of ETS."). Accordingly, Plaintiff's Eighth Amendment ETS claim must fail.

### e. First Amendment Retaliation Claim

"Prisoners have a constitutional right to petition the government, and it is a violation of § 1983 for prison officials to retaliate against prisoners for the exercise of that right." *Bartley v. Collins*, No. 95-CV-10161, 2006 WL 1289256, at *4 (S.D.N.Y. May 10, 2006). To state a First Amendment claim of retaliation, an inmate must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the [inmate], and (3) that there was a causal connection between the protected conduct and the adverse action." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (citation, quotation marks, and original alteration omitted). An adverse action is any "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (citation omitted). In determining whether a prison official's

conduct constitutes adverse action, "the court's inquiry must be tailored to the different circumstances in which retaliation claims arise, bearing in mind that prisoners may be required to tolerate more than average citizens." *Id.* (citation, quotation marks, and alterations omitted). "[B]ecause virtually any adverse action taken against a prisoner by a prison official — even those otherwise not rising to the level of a constitutional violation — can be characterized as a constitutionally proscribed retaliatory act," the Second Circuit has instructed that district courts must "approach prisoner retaliation claims with skepticism and particular care." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (citation and quotation marks omitted); *see also Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("Retaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike." (citation and quotation marks omitted)).  Accordingly, First Amendment retaliation claims must be supported by "specific and detailed factual allegations" and not stated in "wholly conclusory terms." *Dolan*, 794 F.3d at 295 (citation and quotation marks omitted).

Here, Plaintiff alleges that, on February 24, 2014, he wrote a letter to Perez "complaining about the assault" and requesting a transfer to another facility out of a "fear[] that he would be assaulted and retaliated against by all defendants."  (Am. Compl. ¶ 29.)  Two days later, while Plaintiff was in the lunch hall, Ulysse "verbally threatened" Plaintiff by telling him "not to file a grievance or he would retaliate and make sure other officers in any facility [he] is transferred to retaliate as well."  (*Id.* ¶ 30.)  Ulysse also stated, "[You're] not going to win with me," and demanded Plaintiff hand over his ace bandage, which Plaintiff did, "out of fear for his life, safety, and to prevent further assaults and retaliation."  (*Id.* ¶¶ 30–31.)  Finally, on March 6, 2014, following Plaintiff's March 4, 2014 transfer to Great Meadow, Plaintiff was "taken to a hearing for a [m]isbehavior report that [he] had no knowledge or notice of" and that was both

"false" and "an act of retaliation" by Ulysse.  (*Id.* ¶¶ 35–36; *see also* Am. Compl. Ex. D6 (misbehavior report); *id.* Ex. D7 (disciplinary hearing disposition).)

Defendants argue that these allegations are conclusory.  (*See* Defs.' Mem. 19.)  The Court disagrees.  These allegations, taken as true for purposes of this Motion, are, if barely, sufficiently specific to state a First Amendment claim of retaliation.  As to the first *Holland* requirement, Plaintiff engaged in protected speech by writing a letter of complaint to Perez.  *See Booth v. Comm'r of Corr.*, No. 19-CV-100, 2019 WL 919580, at *5 (D. Conn. Feb. 25, 2019) ("Filing complaints and grievances is protected activity." (citing *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004)); *Quezada v. Roy*, No. 14-CV-4056, 2017 WL 6887793, at *11 (S.D.N.Y. Dec. 14, 2017) ("[P]rotected activity is not limited to the filing of grievances, and there is some evidence that [the] [p]laintiff complained to [one defendant] about [another defendant's] harassing conduct, which is its own exercise of protected activity." (citation omitted)); *Smith v. Woods*, No. 03-CV-480, 2006 WL 1133247, at *10 (N.D.N.Y. Apr. 24, 2006) (noting that "the First Amendment protects . . . the filing of written grievances and complaints") (citation omitted)), *aff'd*, 219 F. App'x 110 (2d Cir. 2007).  And, as to the second and third *Holland* requirements, Plaintiff sufficiently alleges adverse action that plausibly is causally connected to Plaintiff's protected conduct.  Plaintiff first alleges that Ulysse "verbally threatened" him by telling him "not to file a grievance or he would retaliate and make sure other officers in any facility [he] is transferred to retaliate as well" and further demanded Plaintiff hand over his ace bandage.  (*Id.* ¶¶ 30–31.)  "Verbal threats may qualify as adverse actions" only where they are "sufficiently specific and direct."  *White*, 2018 WL 6726555, at *17 (collecting cases); *see also Terry v. Hulse*, No. 16-CV-252, 2018 WL 4682784, at *11 (S.D.N.Y. Sept. 28, 2018) (same).  Here, Plaintiff explains when and where the threat took place.  Further, Plaintiff indicates that

Ulysse's threat was directly related to the February 2014 incident of alleged assault and to the possibility that a grievance would be filed against him in connection with that incident. To be sure, Plaintiff does not explain what precisely Ulysse's threat was; there is no indication, for example, that Ulysse directly threatened physical harm. However, given that the initial interaction between Ulysse allegedly involved physical harm, and given that Ulysse took Plaintiff's ace bandage following the threat, (*see* Am. Compl. ¶¶ 30–31) — an action that could be understood as designed to cause Plaintiff discomfort and pain — this action could well "deter a similarly situated [inmate] of ordinary firmness from exercising his or her constitutional rights," namely, the filing of a grievance or complaint. *Davis*, 320 F.3d at 353 (citation omitted). Moreover, context suggests that Plaintiff was in fact intimidated by Ulysse's threat. Two days prior, Plaintiff had written a letter to Perez complaining about Ulysse's assault. (*See* Am. Compl. Ex. C1.) And following Ulysse's threat, Plaintiff filed numerous formal grievances relating to other issues. (*See* Am. Compl. Exs. D16–D18, D24–D41.) Yet, despite taking these actions, Plaintiff did *not* file a formal grievance against Ulysse relating to the assault. The Amended Complaint thus indicates that, just two days after filing a complaint, Ulysse threatened Plaintiff not to file a grievance against him, and that Ulysse's threat had its intended effect. *See Kerman v. City of New York*, 261 F.3d 229, 242 (2d Cir. 2001) (officer's statement to plaintiff that he "would teach [plaintiff] a lesson and give him something to sue for" stated a retaliation claim); *cf. Jacques v. Dep't of Corr.*, No. 18-CV-308, 2018 WL 5619715, at *6 (D. Conn. Oct. 30, 2018) (holding that, "[o]ther than a bare allegation of threats of physical violence, [the plaintiff] has not alleged any facts that could support a claim of retaliation"); *Deangelis v. Property Officer Cowels*, No. 16-CV-472, 2016 WL 4443140, at *2, *4 (D. Conn. Aug. 18, 2016) (holding the plaintiff's allegation that he "filed a lost property claim form" and that the

defendant "later told him that she had lost the receipt and later denied the claim" to be "not sufficiently specific and detailed" because there was no allegation that the defendant "deliberately lost his property receipt in retaliation for his filing a [reimbursement] claim").

Accordingly, Plaintiff plausibly states a First Amendment retaliation claim against Ulysse sufficient to survive a motion to dismiss.[7]  This ruling is without prejudice to Defendants raising this issue in a summary judgment motion.

### f. *Monell* Liability

Plaintiff sues Defendants in both their individual and official capacities.  "A claim asserted against a [defendant] in his official capacity . . . is in effect a claim against the governmental entity itself . . . for 'official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent.'"  *Lore v. City of Syracuse*, 670 F.3d 127, 164 (2d Cir. 2012) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55

---

[7] The Court notes, however, that Plaintiff's other allegations of retaliation are insufficient to state a First Amendment retaliation claim.  Plaintiff alleges that, following his March 4, 2014, transfer to Great Meadow, (*see* Am. Compl. ¶¶ 33–39), he was told by another inmate that there was a note stating that Plaintiff "was an asshole, litigant[,] and grieving threat[,] and [giving] an order to destroy all of [his] property," (*id.* ¶ 34).  Yet, Plaintiff does not allege that his property was destroyed or otherwise connect this allegation to an act of retaliation.  Plaintiff also claims that Ulysse directed that a false and retaliatory misbehavior report be filed against him, that he "was taken to a hearing" on March 6, 2014 regarding the report without prior notice, and that he was found "guilty and punished" despite the fact that the "hearing officer stated [that] he could not locate [the relevant] evidence for [P]laintiff to defend himself."  (*Id.* ¶¶ 35–36.)  Although it is true that the Second Circuit has held that "the filing of false misbehavior reports" — at least those that result in the imposition of serious punishments, such as "three weeks in keeplock" — "would deter a prisoner of ordinary firmness from vindicating his or her constitutional rights through the grievance process and the courts" and thus constitute adverse action, *Gill*, 389 F.3d at 384 (2d Cir. 2004), here, Plaintiff both fails to describe the punishment's type or duration and fails to plausibly connect the false misbehavior report to Ulysse.  Indeed, the misbehavior report was filed not by Ulysse but by a non-party prison official, and does not name or involve Ulysse.  (Am. Compl. ¶¶ 35–36.)  Plaintiff finally claims that, "[s]ince March 6, 2014, [he] has experienced numerous acts of retaliation by employees of [DOCCS] in regards to filing complaints, grievances, property claims[,] and lawsuits."  (*Id.* ¶ 37.)  This claim, however, is "wholly conclusory," *Dolan*, 794 F.3d at 295, as it identifies no specific retaliatory act.

(1978))).  "Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort."  *Monell*, 436 U.S. at 691.  Thus, "to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury."  *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (citing *Monell*, 436 U.S. at 690–91).  The fifth element reflects the notion that a *Monell* defendant "may not be held liable under § 1983 solely because it employs a tortfeasor."  *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (noting that a municipality may not be held liable under § 1983 "by application of the doctrine of respondeat superior" (citation and italics omitted)).  Rather, "municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right."  *Newton v. City of New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008).  A plaintiff may satisfy the fifth element by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted).

Here, Plaintiff fails entirely to allege that any Defendant acted pursuant to a formal DOCCS or other policy, that any Defendant acted pursuant to a DOCCS, Downstate, or other practice or custom, that any Defendant was responsible for the promulgation of policies relevant

to Plaintiff's claims, or that any Defendant failed to receive adequate training or supervision and, because of that failure, caused Plaintiff's injuries. Accordingly, because Plaintiff does not allege the fifth element required to state a *Monell* claim, his claims against Defendants in their official capacities must be dismissed. *See McKenzie v. City of Mount Vernon*, No. 18-CV-603, 2018 WL 6831157, at *7 (S.D.N.Y. Dec. 28, 2018) (dismissing *Monell* claims where the plaintiff did "not allege any facts suggesting a policy or custom that led to [the] alleged" deprivation).

## III. Conclusion

For the reasons stated above, Defendants' Motion To Dismiss is granted in part and denied in part.[8]

The Court dismisses Plaintiff's state-law claims *with* prejudice.

The Court dismisses Plaintiff's claims against Defendants Perez, Benheim, Nameth, Travis, and Whelan, as well as Plaintiff's claims against all Defendants in their official capacities, *without* prejudice. If Plaintiff wishes to file a second amended complaint, Plaintiff must do so within 30 days of the date of this Opinion. Plaintiff should include within that second amended complaint any changes to correct the deficiencies identified in this Opinion that Plaintiff wishes the Court to consider. Plaintiff is advised that the second amended complaint will replace, not supplement, all prior complaints. The second amended complaint must contain all of the claims, factual allegations, and exhibits that Plaintiff wishes the Court to consider. If Plaintiff fails to abide by the 30-day deadline, his claims may be dismissed with prejudice.

---

[8] The Court need not address at this time whether any Defendant is entitled to qualified immunity. Defendants' one-page qualified immunity argument fails to meaningfully apply the relevant law to the facts of this case. (*See* Defs.' Mem. 21–22.) Further, Defendants "are represented by counsel and attempting to dismiss a pro se Complaint." *Whitley v. Bowden*, No. 17-CV-3564, 2018 WL 2170313, at *12 (S.D.N.Y. May 10, 2018). Defendants are free to renew — and sufficiently argue — their qualified immunity defense at a later date.

The Clerk is respectfully directed to terminate the pending Motion, (Dkt. No. 32), and to mail a copy of this Order to Plaintiff.

SO ORDERED.

Dated: March 18, 2019
       White Plains, New York

KENNETH M. KARAS
United States District Judge