UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SHAKEE PERKINS,

                            Plaintiff,

             v.

ADA PEREZ, *et al.*,

                            Defendants.

No. 17-CV-1341 (KMK)

OPINION & ORDER

Appearances:

Shakee Perkins
Coxsackie, NY
*Pro se Plaintiff*

Janice Powers, Esq.
New York State Office of the Attorney General
White Plains, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

       After dismissal of his First Amended Complaint, Shakee Perkins ("Plaintiff"), currently incarcerated at Greene Correctional Facility, renews his pro se Action against Superintendent Ada Perez ("Perez"), Medical Director John Benheim ("Dr. Benheim"), Correction Officer ("C.O.") Richard Ulysse ("Ulysse"), C.O. Damon Travis ("Travis"), C.O. Ryan Whelan ("Whelan"), and Sergeant Fred Nameth ("Nameth") (collectively, "Defendants"). Plaintiff, who sues Defendants under 42 U.S.C. § 1983 both individually and in their official capacities, alleges that Defendants violated his constitutional rights and committed state-law torts against him.

       Before the Court is Defendants' renewed Motion To Dismiss (the "Motion"). (*See* Not. of Mot. (Dkt. No. 56).) For the following reasons, the Motion is granted in part and denied in part.

## I. Background

### A. Factual Background

The following facts are drawn from Plaintiff's Second Amended Complaint ("SAC") and the exhibits attached to it, (SAC. (Dkt. No. 49)), and are taken as true for the purpose of resolving the instant Motion.

At about 9:15 a.m. on February 21, 2014, Plaintiff was in his cell at Downstate Correctional Facility ("Downstate") when an unnamed porter came to collect Plaintiff's laundry (SAC. ¶ 1–2.)[1]. The porter handed Plaintiff a pen to write his initials on his clothing. (*Id.* ¶ 2.) However, when Plaintiff "attempted to return the pen to the porter," Defendant Ulysse "without just cause [or] provocation . . . grabbed and strong-armed [P]laintiff's right hand in a[n] aggressive stronghold[,] causing [P]laintiff's wrist to swell and become numb." (*Id.* ¶ 3.) Ulysse further "squeez[ed]" Plaintiff's "right hand and aggressively pull[ed] [his] arm out of the hole in the door until [his] elbow reached the outer edge of the hole." (*Id.* ¶ 4.) Although Plaintiff "hopelessly begged" Ulysse to stop and "screamed for help," Ulysse did not stop and instead "braced his foot/feet up against the cell door using both hands to get a better grip on" Plaintiff's hand, causing further pain. (*Id.* ¶¶ 4–5.) Ulysse thereafter "became more violent and aggressive;" and "intentionally pull[ed]" Plaintiff's "entire right arm out of the hole on the cell door until . . . [his] body was pressed up against the cell door." (*Id.* ¶ 6.) Ulysse then "aggressively twisted and yanked [P]laintiff's right arm in a downward violent motion[,] causing more damage and severe pain." (*Id.* ¶ 7.) Plaintiff "struggled with" Ulysse for "approximately

---

[1] Plaintiff's filings in this case contain both numbered and unnumbered paragraphs. Where not possible to cite to the numbered paragraph, the Court cites to the ECF-generated page numbers stamped at the top right-hand corner of the document.

2

four more minutes before surrendering his arm." (*Id.* ¶ 8.) Ulysse thereafter released Plaintiff's arm and "walked way laughing." (*Id.* ¶ 9.)

Plaintiff "screamed for help in pain" and "requested emergency medical attention" for twenty minutes. (*Id.*) Plaintiff was then escorted to Nameth's office by an unknown correctional officer. (*Id.* ¶ 9.) Nameth questioned Plaintiff and two additional inmate witnesses about the incident. (*Id.* ¶¶ 10–11.) Plaintiff requested that "the investigation be postponed so that [he] could] receive medical attention," but Nameth "denied [the] request and stated: 'You have to answer these questions first.'" (*Id* at ¶ 10.) Plaintiff alleges the questioning caused a delay in his "emergency medical needs" which resulted in the swelling of his "right hand and mid-area of the arm." (*Id.* ¶ 11.)

"After a period of twenty minutes or so," Plaintiff was taken to the medical unit. (*Id.* ¶ 12.) X-rays and photographs were taken of the injury. (*Id.*) In examining Plaintiff, Defendant Dr. Benheim "grabbed" Plaintiff's left arm, and despite Plaintiff's complaints "attempted to put [his] right arm in a medical sling." (*Id.* ¶ 13.) Dr. Benheim "forced" Plaintiff to lie down "by picking [him] up by the legs" and pushing his "upper body down on the bed." (*Id.* ¶ 14.) He then attached an I.V. with an "unknown narcotic" to Plaintiff's arm without asking Plaintiff's permission or whether he was allergic to it. (*Id.* ¶¶ 15–16.) Plaintiff "begged" Dr. Benheim not to touch him, "refused medical treatment from the medical unit," and asked to be treated by some other doctor at an outside facility, but that request was refused. (*Id.* ¶ 13–15.) Plaintiff "immediately" began to "sweat, feel cold,[and experience] breathing issues," as well as feel dizzy, panic-struck, and naus[eous]." (*Id.* ¶ 17.) Plaintiff also began to "hallucinate," "experience[] short epileptic episodes," and felt "half his body numbed, frozen and the other half in great pain." (*Id.* ¶ 17.) Dr. Benheim injected Plaintiff with "another dose of an unknown

3

narcotic," causing Plaintiff pain from the needle — which was inserted "carelessly" into his injured arm — and causing Plaintiff to become "incoherent" and "unresponsive" and to have "blurry vision."  (*Id.* ¶ 18.)

Plaintiff was then referred to an outside hospital for further treatment.  (*Id.* ¶ 24.)  Defendants Travis and Whelan, responsible for transporting Plaintiff to the van that would take him to the hospital, "aggressively grabbed [his] arms, pulling both arms towards [his] back," and placed him in "mechanical restraints" causing Plaintiff to feel a "a great amount of force and pain."  (*Id.* ¶ 19.)  Plaintiff "tried to speak but was unable to [do so] because of the narcotic effects" of the medicine given to him by Dr. Benheim.  (*Id.* ¶ 20.)  Instead, Plaintiff cried and moaned to signal his distress.  (*Id.*)  Travis and Whelan carried Plaintiff to the van instead of putting Plaintiff in a "medical mobile bed or portable carry stretcher," and, in placing him in the van, failed to fasten a seat belt around him.  (*Id.*)

Before they left for the hospital, Whelan smoked a cigarette, causing Plaintiff "to have trouble breathing."  (*Id.* ¶ 21.)  Further, the van door was left open, causing Plaintiff, who "did not have on a winter coat," to "nearly experience[] hypothermia" and to begin "crying, moaning, shivering, coughing, and breathing very fast."  (*Id.*)  When the van door was closed, Plaintiff was left "restrained in an uncomfortable[,] painful position with no air circulating[,] leaving [him] to inhale" Whelan's cigarette smoke for about fifteen minutes.  (*Id.* ¶ 22.)  Plaintiff then "vomited twice and then blacked out" in the van, and "woke up on the van floor and was unable to get up or move" because of the "ongoing effects of the narcotics [and] the mechanical restraints."  (*Id.* ¶ 23.)  Plaintiff was "incoherent and unresponsive" upon arrival at the hospital.  (*Id.* ¶ 24.)  Following the visit to the hospital, Plaintiff was transported by Travis and Whelan back to Downstate "in the same negligent manner" as before.  (*Id.* ¶ 24.)

4

Upon return to Downstate, Plaintiff was placed in involuntary protective custody ("IPC") without a bed, chair, food, or water, thus forcing him to sit "on the edge of a windowsill" and sleep "in an uncomfortable position." (*Id.* ¶ 25.) Between February 22–24, 2014, Plaintiff repeatedly asked Dr. Benheim and several nurses for a medical shower because his "clothing and body had dried vomit residue," but he was denied one without explanation. (*Id.* ¶¶ 26–27.)

On February 24, 2014, Plaintiff was released back into Downstate's general population and given an ace bandage to "keep [his] right arm in a comfortable position to heal." (*Id.* ¶ 28.) Upon return to his cell, he wrote a letter to Defendant Perez complaining about the assault and negligent medical treatment and requesting to be moved to another facility "because he feared that he would be assaulted and retaliated against by all defendants mentioned in this complaint." (*Id.* ¶ 29; *see also* SAC Ex. C1 (letter to Perez).)

On February 26, 2014, Defendant Ulysse approached Plaintiff in the mess hall "during lunch chow" and "verbally threatened" him to not "file a grievance or he would retaliate and make sure other officers in any facility [P]laintiff is transferred to retaliate [against him] as well." (SAC ¶ 30.) Ulysse stated, "you['re] not going to win with me," and forced Plaintiff to "remove his ace-bandage off his arm and hand it over." (*Id.* ¶¶ 30–31.) Plaintiff "filed a grievance about the assault, retaliation, negligence[,] and mess hall encounter with Ulysse." (*Id.* ¶ 31; *see also* SAC Ex. C2 (grievance regarding incident).) Plaintiff also made several requests for medical care between February 26 and March 3, 2014, but received no response. (SAC ¶ 32.)

On March 4, 2014, Plaintiff was transferred to Great Meadow Correctional Facility ("Great Meadow"). (*Id.* ¶ 33.) On March 6, 2014, Plaintiff was subjected to a hearing based on a misbehavior report, filed by an unnamed prison officer, which Plaintiff alleges was false and an act of retaliation on behalf of Ulysse. (*Id.* ¶ 34; *see also* First Am. Compl. ("FAC") Ex. D6

(misbehavior report).) Plaintiff further alleges that, since March 6, 2014, he has been targeted by several unnamed correctional employees "in regards to filing complaints, grievances, property claims an lawsuits," all in furtherance of Ulysse's earlier threat of retaliation. (SAC ¶ 35.) Although Plaintiff has continued to pursue his administrative remedies, he alleges that he has been deterred from filing some "complaints, grievances and appeals" due to Ulysse's threat, that some of these have not been addressed or acknowledged, and that others have been destroyed. (*Id.* ¶ 36)

B.  Procedural Background

Plaintiff signed his initial Complaint January 18, 2017. (*See* Compl. 55 (Dkt. No. 2).) Plaintiff completed his request to proceed in forma pauperis ("IFP") on the same day. (*See* Dkt. No. 1.) The Court received Plaintiff's initial Complaint and IFP request on February 22, 2017. (*See* Dkt. (dates associated with entries at Dkt. Nos. 1, 2).)

On February 23, 2017, the Court granted Plaintiff's IFP request. (Dkt. No. 4.) On June 23, 2017, Plaintiff filed his First Amended Complaint, (Dkt. No. 15), and On March 5, 2018, Defendants filed their first Motion To Dismiss (the "First Motion") (Dkt. No. 31). On March 18, 2019, the Court issued an Opinion and Order (the "First Opinion") granting in part and denying in part Defendants' First Motion. (Dkt. No. 40.) *See Perkins v. Perez*, No. 17-CV-1341, 2019 WL 1244495, at *1 (S.D.N.Y. Mar. 18, 2019). In particular, the Court dismissed all of Plaintiff's state-law claims (with prejudice), Plaintiff's federal (individual capacity) claims against Defendants Perez, Benheim, Nameth, Travis, and Whelan (without prejudice); and all official capacity claims (without prejudice). *Id.* at *16. The Court declined, however, to dismiss Plaintiff's First Amendment retaliation claim against Defendant Ulysse. *Id.* at *15.[2] The Court

---

[2] The First Motion (and thus the Court's First Opinion) did not address Plaintiff's Eighth

6

provided Plaintiff with 30 days to file a second amended complaint and cure deficiencies identified in the First Opinion. *Id.*

After several extensions of the relevant deadline, Plaintiff filed a Second Amended Complaint on June 13, 2019. (Dkt. No. 49.) On July 26, 2019, Defendants moved to dismiss with prejudice all previously dismissed claims. (Not. of Mot. (Dkt. No. 56); Defs' Mem. (Dkt. No. 57).) On September 16, 2019, Plaintiff filed his response. (*See* Pl.'s Mem. of Law in Opp'n to Mot. ("Pl.'s Mem.") (Dkt. No. 61).) On October 11, 2019, Defendants filed a Reply. (*See* Defs.' Reply Mem. of Law in Further Supp. of Mot. ("Defs.' Reply") (Dkt. No. 64).)

## II. Discussion

Defendants move to dismiss the SAC pursuant to Federal Rule of Civil 12(b)(6) and the "law-of-the-case" doctrine, *see United States v. Carr*, 557 F.3d 93, 102 (2d Cir. 2009) ("[W]hen a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case.") (citation and quotation marks omitted). (*See generally* Defs.' Mem.)

### A. Rule 12(b)(6)

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, quotation marks, and alterations omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked

---

Amendment claims against Defendant Ulysse. *Id.* at *10 n. 5.

assertions devoid of further factual enhancement." *Id.* (quotation marks and alteration omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff need allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering a motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the sufficiency of a complaint we accept as true all factual allegations . . . ." (quotation marks omitted)). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Where, as here, a plaintiff proceeds pro se, the "complaint[] must be construed liberally

8

and interpreted to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and quotation marks omitted)).

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks and citation omitted). When a plaintiff proceeds pro se, however, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted), including "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted), statements by the plaintiff "submitted in response to [a] defendant's request for a pre-motion conference," *Jones v. Fed. Bureau of Prisons*, No. 11-CV-4733, 2013 WL 5300721, at *2 (E.D.N.Y. Sept. 19, 2013), and "documents that the plaintiff[] either possessed or knew about and upon which [the plaintiff] relied in bringing the suit," *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000).

B.  Law of the Case

"The law-of-the-case doctrine generally provides that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Musacchio v. United States*, 136 S. Ct. 709, 716 (2016) (citation and quotation marks omitted). Accordingly, courts should "be loathe to [revisit earlier decisions] in the absence of extraordinary circumstances." *Knox v. Countrywide Bank*, No. 13–CV–3789, 2015 WL 5254519, at *5 (E.D.N.Y. July 29, 2015) (citation and quotation marks omitted), *adopted by* 2015 WL 5285738 (E.D.N.Y. Sept. 9, 2015), *aff'd* 673 F. App'x 31 (2d Cir. 2016); *see also Bergerson v. N.Y. State Office of Mental Health, Cent. N.Y. Psychiatric Ctr.*, 652 F.3d 277, 288 (2d Cir. 2011) (noting that "there is a strong presumption against amendment of prior orders" (citation omitted)). Such circumstances should generally be limited to "cogent or compelling reasons not to [follow the earlier decision], such as an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Bellezza v. Holland*, No. 09–CV–8434, 2011 WL 2848141, at *3 (S.D.N.Y. July 12, 2011) (citation and quotation marks omitted). "The mere filing of an [a]mended [c]omplaint does not entitle [a] [p]laintiff to relitigate his claims absent new factual allegations." *Weslowski v. Zugibe*, 96 F. Supp. 3d 308, 316 (S.D.N.Y. 2015). Where an amended complaint "is in large part identical to a [p]laintiff's first [c]omplaint, the law of the case doctrine counsels against reconsideration of" a court's earlier dismissal. *Id.* (citation omitted); *see also State Farm Mut. Auto. Ins. Co. v. Mallela*, No. 00–CV–4923, 2002 WL 31946762, at *8 (E.D.N.Y. Nov. 21, 2002) (applying law of the case doctrine where the "plaintiff's [c]omplaint [was] very similar to [the] plaintiff's [p]rior [c]omplaint").

C. Analysis

A comparison of the SAC with the recently dismissed First Amended Complaint ("FAC") reveals that, with the exception of certain allegations against Dr. Benheim (to be discussed below), the two complaints are substantially identical. The law-of-the-case doctrine, therefore, counsels strongly in favor of dismissal of most claims. *See Weslowski,* 96 F. Supp. 3d at 316 (explaining that where an amended complaint "is in large part identical" to an earlier, dismissed complaint, "the law of the case doctrine counsels against reconsideration"); *see also State Farm*, 2002 WL 31946762, at *8 (explaining that where an operative complaint is "very similar" to a prior, dismissed complaint, the earlier order of dismissal usually has preclusive effect). Accordingly, in addressing the Plaintiff's renewed claims, the Court largely relies on, and incorporates, its previous analysis of Plaintiff's claims. *See Perkins,* 2019 WL 1244495. Only where Plaintiff's SAC differs materially from the First Amended Complaint will the Court address Plaintiff's claims extensively.

1. Personal Involvement of Defendant Perez

In the Court's First Opinion, the Court found that "Plaintiff does not allege that Defendant Perez herself committed, or 'participated directly' in, the alleged assault and inadequate medical care or that Perez 'created a policy or custom' enabling those allegations." *Id.* at *9 (citation omitted). The Court also found that while Plaintiff attempted to advance "gross negligence," "failure to remedy," or "deliberate indifference" theories of personal involvement based on a transfer request submitted to Perez, Plaintiff also conceded that "less than two weeks after requesting a facility transfer from Perez, he both received a response and was in fact transferred." *Id.* at *10 (quotation marks omitted). The Court therefore concluded that it "cannot be said . . . that Perez failed to address Plaintiff's request, that Perez was

deliberately indifferent to Plaintiff's complaint, or that Perez was grossly negligent in supervising subordinates in responding to Plaintiff's request." *Id.*; *see also Thompson v. Booth*, No. 16-CV-3477, 2018 WL 4760663, at *7 (S.D.N.Y. Sept. 28, 2018) (holding no personal involvement where "[t]here is no allegation that [a defendant] failed to act on information regarding the [allegedly] unlawful conduct or otherwise acted with gross negligence" (alteration in original) (citation and quotation marks omitted)). Accordingly, the Court held that Plaintiff failed to allege Perez's personal involvement in the alleged constitutional violations. *See Perkins*, 2019 WL 1244495, at *10; *see also Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (explaining the standards for establishing individual liability under § 1983).

Plaintiff's SAC mirrors his dismissed FAC with respect to Defendant Perez almost to the word. Once again, Plaintiff alleges only that, on February 24, 2019, he wrote a letter to Defendant Perez complaining about the February 21–24 incidents and requesting to be moved to another facility "because he feared that he would be assaulted and retaliated against by all defendants mentioned in this complaint." (SAC ¶ 29; *see* also SAC Ex. C1 (letter to Perez).) And once again, Plaintiff acknowledges that on March 4, 2014, he was transferred to Great Meadow. (*Id.* ¶ 33.) In light of Plaintiff's failure to cure the deficiencies identified in the Court's First Opinion, the Court again dismisses, this time with prejudice, all claims against Defendant Perez for substantially the same reasons articulated in that First Opinion. *See Perkins*, 2019 WL 1244495, at *9–10.

### 2. Constitutional Claims Against Dr. Benheim

In the Court's First Opinion, the Court rejected Plaintiff's Eighth Amendment claims as "nothing more than a non-actionable disagreement with the treatment provided to him by Dr. Benheim." *Id.* at *11. Consistent with Plaintiff's First Amended Complaint, (*see* FAC 29

("Plaintiff's injuries . . . w[ere] caused by ignorance and denial of medical treatment . . .")), however, the Court analyzed Plaintiff's claims as alleging a "deprivation of adequate medical care." *Perkins*, 2019 WL 1244495, at *11 (citation and quotation marks omitted). The Court therefore concluded that "Dr. Benheim did not ignore Plaintiff's medical needs or deny Plaintiff medical care," but rather "conducted an examination of Plaintiff's arm and shoulder, treated him with pain medication, and, having taken contemporaneous notes as to Plaintiff's condition and possible diagnosis, referred Plaintiff for further treatment." *Id.*; *see also Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) (noting that "mere disagreement over the proper treatment" is insufficient, provided that "the treatment given is adequate"); *Whitley v. Ort*, No. 17-CV-3652, 2018 WL 4684144, at *8 (S.D.N.Y. Sept. 28, 2018) (explaining that negligent medical malpractice is insufficient to state a claim of deliberate indifference); *Melvin v. County of Westchester*, No. 14-CV-2995, 2016 WL 1254394, at *7 (S.D.N.Y. Mar. 29, 2016) (holding that "treatment of a prisoner's medical condition generally defeats a claim of deliberate indifference" (citation and quotation marks omitted)). Similarly, the Court concluded that, "to the extent Plaintiff alleges that Dr. Benheim improperly denied him a medical shower from February 22–24, 2014, such a claim does not rise to the level of an Eighth Amendment violation." *Perkins*, 2019 WL 1244495, at *11 (docket citation omitted); *see also Williams v. Ramos*, No. 13-CV-826, 2013 WL 7017674, at *6 (S.D.N.Y. Dec. 23, 2013) ("Courts in this circuit routinely reject conditions-of-confinement claims based on the temporary denial of showers . . . ."). The Court therefore dismissed Plaintiff's claims against Dr. Benheim without prejudice. *See Perkins*, 2019 WL 1244495, at *11.

In the SAC, however, Plaintiff has altered some of the material allegations. Whereas in his FAC, Plaintiff alleged that "Plaintiff did not refuse medical treatment," (FAC 27,) Plaintiff

13

now expressly alleges that he "refused medical treatment," (SAC ¶ 13, 17). Whereas Plaintiff previously alleged that Dr. Benheim "[r]ecklessly and carelessly" treated him with an unknown narcotic, (FAC 28,) Plaintiff now alleges that Dr. Benheim "intentionally" treated him "knowing that he lacked informed consent," (SAC 17). Plaintiff also alleges that Dr. Benheim "failed to inform [P]laintiff of the potential risk of Toradol treatment" and that Plaintiff had "a known medical history of cardiac arrhythmia" which can be implicated by Toradol treatments. (*Id.* at 18.) Plaintiff further alleges that Dr. Benheim engaged in this "unlawful treatment for penological reasons." (*Id.* at 17.) Plaintiff thus argues that Dr. Benheim's treatment amounts to "cruel and unusual punishment" in violation of the Eighth Amendment, (*see* SAC ¶ 38,) and a deprivation of protected liberty interests in violation of the Fourteenth Amendment. (SAC 19.)

Defendants appear not to have noticed, let alone responded to, these substantial differences in Plaintiff's two complaints. (*See* Defs.' Mem. 5–7; Defs.' Reply 3.) This is a consequential oversight. The Second Circuit has expressly recognized that prisoners retain a Fourteenth Amendment right to refuse medical treatment, and that this right can be implicated by the deprivation of medical information. *See Pabon v. Wright*, 459 F.3d 241, 251 (2d Cir. 2006) (explaining that a "right to medical information . . . is a derivative of the right to refuse treatment" and describing the circumstances in which a prisoner may advance a claim based on such a right.). Here, Plaintiff alleges that Dr. Benheim injected him with a drug not only in the absence of informed consent, but in defiance of his articulated refusal of treatment. (SAC ¶¶ 13–15.) To be sure, "[a] determination that a prisoner's right to refuse medical treatment has been impaired does not end the inquiry" concerning whether a constitutional violation has occurred. *Pabon*, 459 F.3d at 252. As with prisoner's rights generally, "[a] prisoner can establish liability for the violation of a constitutional right only if his individual liberty interest outweighs the

14

relevant countervailing state interests." *Id.* (citation omitted). In the absence of any arguments from Defendants, however, the Court is in no position to conduct such a balancing test and determine whether treatment of Plaintiff over his objections was justifiable. Accordingly, Plaintiff's Fourteenth Amendment claim against Dr. Benheim survives the instant Motion.

Similarly, Defendants' Motion does not address Plaintiff's Eighth Amendment claims based on Dr. Benehim's *affirmative* conduct (as distinct from claims based on a theory of "deliberate indifference"). In the absence of any argument by Defendants, and in light of the Court's obligation to accept all allegations as true and draw all inferences in favor of Plaintiff, the Court cannot rule out the possibility that the alleged conduct amounts to an Eighth Amendment violation. While the Court is not obligated to accept as true Plaintiff's conclusory allegation about Dr. Benheim's intent (i.e., that he engaged in "unlawful treatment for penological reasons," (SAC 17)), Plaintiff's allegations that he "begged" Dr. Benheim not to touch him and "refused medical treatment," (*id.* ¶¶ 13–15), are sufficiently specific that they cannot be disregarded at the pleading stage, *Krys v. Pigott*, 749 F.3d 117, 128 (2d Cir. 2014) (accepting as true all factual allegations while rejecting allegations that are wholly conclusory). If Dr. Benheim did inject Plaintiff with narcotics against his will in order to punish him, (SAC ¶¶ 14–16, 17), and if the injection did induce Plaintiff to vomit, hallucinate, and experience great pain, (*id.* ¶¶ 17-23), this might well constitute an Eighth Amendment violation. *See Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (explaining that a government official violates the Eighth Amendment where he applies force "maliciously and sadistically to cause harm" and where the conduct is "objectively harmful enough to establish a constitutional violation" (quotation marks omitted)). Accordingly, Plaintiff's Eighth Amendment claims against Dr. Benheim for intentional, punitive mistreatment must survive the instant Motion as well.

### 3. Eighth Amendment Claims Against Nameth

In the Court's First Opinion, the Court found that Plaintiff failed to "establish Nameth's deliberate indifference to Plaintiff's medical needs," because Plaintiff did not allege that Nameth "delayed care as a form of punishment, ignored a life-threatening and fast-degenerating condition for several days, or delayed major surgery." *Perkins*, 2019 WL 1244495, at *12 (citation and quotation marks omitted).  As the Court explained, Plaintiff's allegations establish that Plaintiff "received medical treatment less than one hour after the alleged assault, and that Nameth's investigation delayed medical treatment [only] by some twenty minutes." *Id*.  The Court concluded that such minimal delays could not support Plaintiff's Eighth Amendment claim. *See id.*; *see also Waller v. DuBois*, No. 16-CV-6697, 2018 WL 1605079, at *7 (S.D.N.Y. Mar. 29, 2018) (dismissing deliberate indifference claim in part because "the alleged delay . . . was minimal").

Once again, Plaintiff's SAC mirrors his dismissed FAC almost to the word with respect to Defendant Nameth.  (*See* FAC 10-12; SAC 10-12.)  In both complaints, Plaintiff alleges only that he was escorted to Nameth's office "to be questioned about the incident that occurred"; "Plaintiff complained about his injuries and pain and asked [Nameth whether] the investigation [could] be postponed so that [he could] receive medical treatment"; and Nameth "denied [his] request and stated: 'You have to answer these questions first.'"  (FAC ¶¶ 10; SAC ¶ 10.) According to both complaints, the delay ultimately lasted "twenty minutes or so," after which Plaintiff was escorted for medical care. (FAC ¶¶ 12; SAC ¶ 12.)  Accordingly, the Court again dismisses, this time with prejudice, all claims against Defendant Nameth for substantially the same reasons articulated in the First Opinion.  *See Perkins*, 2019 WL 1244495, at *11–12; *see also Pabon v. Wright*, No. 99-CV-2196, 2004 WL 628784, at *8 (S.D.N.Y. Mar. 29, 2004), *aff'd*,

459 F.3d 241 ("[A] delay in treatment does not violate the constitution unless it involves an act or failure to act that evinces a conscious disregard of a substantial risk of serious harm.") (citation and quotation marks omitted) (alteration in original)).

### 4. Eighth Amendment Claims Against Travis and Whelan

In the First Opinion, this Court concluded that Plaintiff's claims of excessive force against Travis and Whelan were, "at most, [] de minimis allegation[s] that do[] not implicate the Eighth Amendment." *Perkins*, 2019 WL 1244495, at *12. In particular, the Court noted that Plaintiff's "failure to allege any continuing injury from the handcuffing is 'fatal' to a claim of excessive force. *Id.* (citation omitted); *see also Blue v. City of New York*, No. 14-CV-7836, 2018 WL 1136613, at *11 (S.D.N.Y. Mar. 1, 2018) ("Generally, handcuffing that does not cause injury beyond temporary discomfort or bruising does not rise to the level of an excessive force claim." (citation omitted)). While Plaintiff's First Amended Complaint suggested that Plaintiff "showed signs of distress from the restraints by crying and moaning," (FAC ¶ 20,) Plaintiff did not "suggest that these actions caused him a lasting injury,'" *Perkins*, 2019 WL 1244495, at *12 (citation and quotation marks omitted). Similarly, the Court explained that Plaintiff failed to allege that he was subjected to constitutionally cognizable, "unreasonably high" levels of environmental tobacco smoke ("ETS"). *Id.* at *13 (collecting cases); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (explaining that to state an Eight Amendment claim, a plaintiff "must show that he himself is being exposed to unreasonably high levels of ETS"); *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002) ("Objectively, a plaintiff must show that 'he himself is being exposed to unreasonably high levels of ETS.'" (citation omitted)); *Johnson v. Goord*, No. 01-CV-9587, 2005 WL 2811776, at *7 (S.D.N.Y. Oct. 27, 2005) ("[I]nmates do not have an unqualified constitutional right to a smoke-free environment . . .").

Here as well, Plaintiff has cured none of the deficiencies identified in the First Opinion, but simply replicated the allegations in his FAC. In both complaints, Plaintiff alleges that Travis and Whelan "aggressively grabbed [his] arms, pulling both arms towards [his] back," placed him in handcuffs, and "carried [him] by the arms" to the van transporting him to the hospital, rather than placing him in a cart or stretcher. (FAC ¶¶ 19–20; SAC ¶¶ 19–20.) In both complaints, Plaintiff contends that Travis and Whelan did so while "highly aware of [his] injuries and disabilities after receiving medical reports that [were] required to be giv[en] to" outside physicians. (FAC at 30; SAC at 19.) Similarly, in both complaints Plaintiff alleges that Whelan "began smoking a cigarette" while Plaintiff was in the van with the door open, causing him "to have trouble breathing." (FAC ¶ 21; SAC ¶ 21.) And in both complaints, Plaintiff further alleges that the van door was then closed, causing Plaintiff "to inhale [] second hand smoke and carbon-monoxide for approximately ten to fifteen minutes or so" before the van departed. (*Id.* ¶ 22; SAC ¶ 22.) Because these are the sum and total of the allegations against Travis and Whelan, and because the allegations in the two complaints are nearly identical (in fact, almost word-for-word), the Court dismisses these claims again, but with prejudice, for substantially the reasons articulated in the First Opinion. *See Perkins,* 2019 WL 1244495, at *13.

### 5. *Monell* Claims

In its First Opinion, the Court dismissed all official capacity claims on the grounds that Plaintiff failed to allege that "an official policy of the municipality caused the constitutional injury." *Id.* at *15–16 (citation and quotation marks omitted); *see also Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) ("[T]o prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove . . . that an official policy of the municipality caused the constitutional injury." (citation omitted)). In particular, the Court noted

that "Plaintiff fails entirely to allege that any Defendant acted pursuant to a formal DOCCS [Department of Corrections and Community Supervision] or other policy, that any Defendant acted pursuant to a DOCCS, Downstate, or other practice or custom, that any Defendant was responsible for the promulgation of policies relevant to Plaintiff's claims, or that any Defendant failed to receive adequate training or supervision and, because of that failure, caused Plaintiff's injuries." *Perkins*, 2019 WL 1244495, at *16; *see also Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (enumerating the various ways that a plaintiff can allege a municipality's causing constitutional injury). Plaintiff's SAC alleges no new facts concerning any municipal custom, policy or policy-maker, and thus does not alter this Court's analysis or conclusions. Accordingly, Plaintiff's *Monell* claims are again dismissed, but this time with prejudice, for substantially the reasons articulated in this Court's First Opinion. *See Perkins*, 2019 WL 1244495, at *16.

### 6. State Law Claims

In the First Opinion, the Court dismissed with prejudice all of Plaintiff's state-law claims because these claims were time-barred. *See id.* at *6. In light of that dismissal with prejudice, Plaintiff's repleading is improper and such claims must be dismissed. *See Samuels v. N. Telecom, Inc.*, 942 F.2d 834, 836 (2d Cir. 1991) ("A dismissal with prejudice has the effect of a final adjudication on the merits favorable to defendant and bars future suits brought by plaintiff upon the same cause of action." (citation and quotation marks omitted)).

Moreover, even if the Court were to reconsider Plaintiff's state law claims, it would reach the same conclusion. "The accrual of pendant state law tort claims . . . in federal court actions is governed by state law." *Mitchell v. Home*, 377 F. Supp. 2d 361, 377 (S.D.N.Y. 2005). In New York, the statute of limitations for intentional torts is one year. *See* N.Y. C.P.L.R. § 215(3).

19

Plaintiff alleges state-law intentional torts occurring between February 21, 2014 and about March 6, 2014. (*See generally* SAC.) Plaintiff's initial Complaint was not mailed until January 18, 2017. (*See* Dkt. No. 2). Therefore, Plaintiff's state-law claims are time-barred and were properly dismissed with prejudice.

### III. Conclusion

For the reasons stated above, Defendants' Motion To Dismiss is granted in part and denied in part.

The Court again dismisses Plaintiff's state-law claims *with* prejudice.

The Court again dismisses Plaintiff's claims against Defendants Perez, Nameth, Travis, and Whelan, as well as all claims against Defendants in their official capacities. This time, however, the Court dismisses these claims *with* prejudice.

Plaintiff's Eighth and Fourteenth Amendment claims against Defendant Dr. Benheim survive the instant Motion.[3] This ruling is without prejudice to Defendants raising arguments related to those discussed here in subsequent stages of the proceedings.

The Clerk is respectfully directed to terminate the pending Motion, (Dkt. No. 56), and to mail a copy of this Order to Plaintiff.

The Court will hold a Status Conference on Wednesday, February 5, 2020 at 10:30 a.m.

SO ORDERED.

Dated: January 15, 2020
　　　　White Plains, New York

KENNETH M. KARAS
United States District Judge

---

[3] This Motion did not challenge Plaintiff's claims with respect to Defendant Ulysse, and so Plaintiff's individual capacity claims against Ulysse remain in effect as well.

20